In the matter of the probate of a paper writing purporting to be the last will and testament of PHILIP M. WHEATON.

[Argued October 18th and 19th, 1904. Filed January 26th, 1905.]

1. Opinions of expert witnesses, expressed in answer to hypothetical questions which included statements of facts not established by evidence, must be accorded little weight where it appears that the opinions are based in whole or in part upon such facts.

2. Evidence that a testator, who was claimed to have been incompetent to make a will, had, both before the execution of the contested paper and afterward up to his death, managed and cared for his property, which was large, and transacted his own business as he had previously done, and at the making of the will had shown knowledge of his estate, recollection of relatives and those who might naturally expect his bounty, and a judgment of what he desired to do in that respect, justified the admission of the will to probate, although experts express opinions against his capacity.

On appeal from the Cape May county orphans court.

*Mr. George H. Peirce, Mr. Edwin G. C. Bleakly* and *Mr. Henry F. Stockwell,* for the appellant.

*Mr. Samuel W. Beldon* and *Mr. Joseph H. Gaskill,* for the respondents.

MAGIE, ORDINARY.

This appeal brings up a decree of the Cape May county orphans court, made June 8th, 1904, admitting to probate a paper writing as the last will and testament of Philip M. Wheaton, deceased, who died a resident of that county on June 19th, 1902.

The appellant is Arabella Wheaton, the widow of the deceased, who filed a caveat against the admission of the paper writing to probate. Her contest in the court below was made upon the sole ground that, at the time of the execution of the paper propounded, deceased lacked testamentary capacity. Her appeal here presents no other ground of objection to the decree admit-

ting it to probate. The contest in the orphans court was very prolonged. The first evidence was taken July 23d, 1902, and the final argument occurred September 30th, 1903. The evidence taken during that period is contained in five volumes of twenty-six hundred and twelve printed pages, which have been presented to this court in the argument of this appeal. The consideration of this mass of printed matter, presenting not only the evidence and the objections of counsel, but repetitious argument of counsel on each question, has taxed my strength and patience. I have devoted much time to the case and am now prepared to state my conclusions, which I think I can do without such a review of the evidence as would unreasonably enlarge this opinion.

The claim of appellant is that on November 15th, 1900, when the deceased executed the disputed paper, he was afflicted with senile dementia of a paranoid or delusional character. In answer to a hypothetical question claimed to present such facts in respect to the deceased as might be considered proved, one of the expert witnesses declares that, in his opinion, the deceased was a "victim of monomaniacal or senile dementia." In answer to the same question in substance, another expert witness declares his opinion to be that the deceased was "suffering from senile dementia, associated with the evidences of disease of the vessels of his brain, and also with evidence of dementia."

These expressions of expert opinion may be considered to fairly represent the grounds on which the lack of testamentary capacity on the part of the deceased can alone be sustained, and without pausing to consider such modifications of these opinions as were declared under the stress of cross-examination, and the presentation of other facts which might be deemed proven, I think there may be two observations made thereon. In the first place, it is obvious that these opinions express practically two conditions of mind—one, the weakening or decay of the mental faculties occasioned by age, and amounting not to mere senility, but to dementia; the other a state of delusion. If from the evidence either condition is not satisfactorily shown, the opinions must carry but little weight.

The facts which I deem to be established and pertinent to this inquiry may be thus briefly expressed. The deceased, at the time of executing the disputed paper, which was on November 15th, 1900, was about seventy years of age. At a very early age he had been left fatherless and had procured employment upon a coasting vessel, and remained for many years in that business, rising from his first position to become a captain. He was evidently of a saving disposition and endowed with business qualities which enabled him to accumulate a large fortune, which, after he left the coasting business, he employed in various enterprises. He was so successful that he died with an estate said to be worth $200,000, and his personal property was inventoried by the administrator *pendente lite* at about $180,000. Up to December 25th, 1899, he was in good health, engaged in his different enterprises, attending to them habitually and continuously, and investing his accumulations with care and prudence.

On that day he was taken sick. A physician who attended him, who was an old friend, declares that he had a stroke of paralysis. From this the deceased, within a few weeks, rallied so as to be enabled to leave his house and go about. But his physical condition underwent an undisputable change. He had lost weight and he walked with less vigor than before. But from the time he was able to, which was some time in June, 1900, he resumed his habit of going to Philadelphia to attend to his business. He was then, and had been for some time, the proprietor of a ship chandlery business, managed by a man in whom he evidently had great confidence, yet deceased had been accustomed to go to the place where that business was carried on to examine into the methods and provide for the means of carrying it on. This habit he resumed when able to return to Philadelphia. He was also, during that time, the president of a business corporation in which he had invested money and which was managed by his son-in-law, the husband of his only child. During the period between his stroke of paralysis and the execution of the disputed paper, deceased continued to invest his accumulations and unemployed capital, loaning sometimes upon notes and sometimes upon mortgages. In these transactions he conducted himself with the same capacity, so far as any witnesses observed, that

had been shown by him during his previous career. He had previously been a member of the official board of the Methodist church which he attended. He took part not only in the meetings of the church, but in the transactions of the official board, expressing his views and opinions on all matters before them as he had previously done.

He proceeded about the business of the execution of this paper in a manner indicating judgment and prudence. He first made inquiries of a lawyer, who had married one of his nieces. The object of his inquiries seemed to relate to his power of disposing of his personal property, and it is fair to infer that he was somewhat surprised to be informed that he was permitted by law to dispose of his whole personal property, and that his wife was not entitled, as he had thought, to one-third thereof.

There is evidence of some statement by the deceased indicating that he had sought other advice on the subject of his wife's right in his personal property. Thereafter he applied to an attorney practicing in Ocean City, where the deceased lived. The attorney was the son of the pastor of the Methodist church which deceased attended. Without going into details of what took place in the interviews between the deceased and the attorney, it is probably sufficient to say that the deceased conducted himself and gave his instructions in a manner indicating a thorough-knowledge of the estate he had the power to dispose of, the persons who might claim some recognition in the disposition thereof and a thorough knowledge of what business he was engaged in. It is not too much to say that unless the evidence of the draughtsman of the will be rejected as false, for which I can discover no reason, the deceased indicated a more than usual degree of capacity in the business of making his will.

An examination of the will will indicate that its provisions must have required thought and judgment; gifts to his nieces and nephews are, in some instances, provided to be offset by debts owed to him by their husbands or wives. The provision for his wife, originally expressed by the deceased in his instructions to include a trust of $20,000, the income of which was to be paid to her during her widowhood, was changed (on the suggestion of his lawyer that the rate of interest might not keep

up at six per cent., which had been deceased's notion) so as to provide for a fund sufficient to raise $1,200 annually for her benefit. The will was then drafted, read over to and considered by deceased, and it was executed in the presence of two witnesses, one of whom was the pastor of the Methodist church. After this execution the attorney who had drafted the will became doubtful whether, since the deceased had given a legacy of some considerable amount to the Methodist church, the *status* of the will might not be affected by the fact that the pastor of the church was an attesting witness. He consequently copied the whole will and the deceased executed the recopied will in the presence of two witnesses who were acquaintances and friends of some standing. The execution was in every way such as is required by law.

After the execution of this paper deceased continued to manage his affairs very much as before. He had, however, in the fall of 1900, closed out his ship chandlery business in Philadelphia, and consequently was not required to go to that city as frequently as before. In other respects, as to collecting interest, enforcing payment when interest was behind and making new investments with prudence and care, his conduct seems to have been not different from that previously exhibited. He was, beside, after the execution, elected a director of a local bank, and from that time he continued to attend its meetings and took part in the discussion of matters which came before the board intelligently.

He seems to have been a devoted member of the church he attended and was liberal in his benefactions. The church property was encumbered by a mortgage for $3,500 held by him. The pastor and the official board resolved to make an effort to raise enough money to pay off that encumbrance. The deceased attended a meeting when this project was opened to the church and subscriptions invited. The project included the liability of those subscribing only in case the whole amount was raised. In the morning meeting deceased subscribed $350; in the evening meeting, the amount subscribed not having been sufficient to bind the subscribers, the deceased made an additional subscription of $150, making in all $500 as his contribution. The sub-

scriptions were payable in one year. Some time in the early
part of June, and about ten days before his death, the officials
of the church desired to close the transaction and take up the
outstanding mortgage encumbrance. A deputation of the board
went to the attending physician of the deceased, who was then
suffering under another stroke of paralysis, and, it cannot be
doubted, was then considered to be near his death. This physi-
cian was a member of the board, and he accompanied the depu-
tation to the bedside of the sick man. Arrangements had been
made to raise money upon notes of the subscribers to the fund
for paying off the mortgage. The deputation went furnished
with a check drawn to the order of the deceased, whether for
$3,000, which would be the amount of the mortgage if the sub-
scription of the deceased was first applied thereto, or for $3,500,
the evidence leaves a little obscure. At all events, a check for one
or the other amount was then delivered to the deceased and the
mortgage and bond were receipted by him and given up to the
church for cancellation. This did not, however, end the trans-
action. The deputation had evidently settled upon a proposition
to be made to the deceased and selected a spokesman. He presented
to the deceased the desire of the church to build at some future
time a new stone edifice, and their wish to create a fund to be
devoted to that purpose. The deceased was asked by the person
speaking for the deputation if he did not desire to contribute
to that fund, with the understanding that the contribution
should be used for no other purpose than to build the new edifice.
He assented and asked them what they thought he ought to give.
It was replied that it was for him to determine. He then turned
to his wife and asked her what she thought he ought to give,
and she suggested $5,000 as a proper amount. The representa-
tives of the board said that they thought that the church would
be satisfied if the deceased would return them the check which
he then held, and which had been given him in payment of
his mortgage. To this the deceased consented and endorsed the
check and delivered it to the representatives of the church, who
accepted it. Prayer was then made, and the deceased took occa-
sion to give some touching advice to the youngest member of
the board, who happened to be present. During all these pro-

ceedings the attending physician was present, and he was, as before stated, a member of the board.

This statement of the facts respecting the business of the deceased from the time of his first stroke of paralysis up to his death, in my judgment, renders it impossible to rely upon the opinion that declares him to be, in the language frequently used in this case, a "senile dement." If a continuance of business ability, the recognition of business men and his medical attendant, his successful conduct of affairs without loss, with prudence and caution, justifies any other conclusion than that the business capacity of the deceased continued during the period in question, it cannot be discovered by me.

The intelligent gentlemen who expressed the opinions which, as I have stated, characterized the claim of the appellant, must obviously be considered to have been affected by the facts presented by the hypothetical question. It seems to me clear that if there had been no other facts presented than those which I have above stated respecting the deceased's business capacity, no opinion could have been expressed by them declaring deceased to have been afflicted by senile dementia. I think it plain that other facts presented in the hypothetical question were deemed to justify the opinions expressed, notwithstanding the facts exhibiting plain business capacity.

The hypothetical question put to the expert, Dr. Pickett, and comprising nearly six printed pages, a large part of which is taken up with statements respecting the alleged hatred and aversion of deceased toward his wife, including as indicative thereof assaults, rudeness in habits and speech, contained further statements to the effect that after the first stroke of paralysis deceased charged his wife with "corresponding with other men," and at times charging her with "putting things in his drink to poison him." Connected with these alleged facts, the hypothetical question included statements of the deceased's conduct as an apparently sincere member of the Methodist church, constant in attendance at the church and giving freely thereto, and indicating to those about him the conduct of a Christian gentleman. Without more detail, I think it is obvious that the hypothetical question presented to these witnesses the case of a man,

formerly on good terms with his wife, becoming, after the first stroke of paralysis, abusive to her, and guilty of conduct which was not occasioned by any apparent cause; in other words, of a man who in his church and official and business life was courteous and agreeable, while in his family life he was a hypocrite and a brute.

This idea of a changed condition of the mind of the deceased toward his wife is, in my judgment, the sole ground upon which this contest can be supported. It is expressed in the evidence of the attending physician, who declares that in his judgment deceased had an "insane aversion to his wife."

It is not unworthy of observation that the evidence respecting the conduct of deceased toward his wife comes almost entirely from her. The deceased and she lived together, keeping no servant. Whatever corroboration her story has comes from those who were present on few occasions, and then casually, nor did they corroborate the most serious of the charges made by the appellant.

A review of her evidence produces a strong impression, not of untruthfulness, but of exaggeration. But assuming that her evidence is to be taken in its full force, it remains to consider whether it indicates, as these experts say, monomania or delusion. If we assume that he had and expressed an actual aversion to his wife, and if we assume that this aversion was first exhibited after his stroke of paralysis, are we justified in drawing the inference that it was due to a mental disturbance? That aversions arise without apparent cause is not unknown. If, however, an aversion arises because of some cause which does not in fact exist—that is, upon some delusion; some conception of the mind as to a person or thing which is in fact untrue, but which is believed to be true—then I think the monomania spoken of may be indicated and possibly extend to dementia. But to produce that effect, it seems to me that the evidence should be sufficient to indicate not mere spasmodical and occasional delusions, but delusions that persist and pervade the mind, and are exhibited in the conduct of the demented man. In this respect, it seems to me, the learned gentlemen have been unconsciously deceived. For example, the alleged fact that deceased charged

his wife with corresponding with other men is not justified by any evidence that I can discover other than this: She states that she had written a letter and gone out to post it while her husband was absent from the house; that he met her when she was returning, and being told that she had posted a letter, she declares that he said to her, "There is no letters to be mailed unless I mail them for you. How do I know who you are writing to? You may be writing to some man for all I know." So far as appears in the evidence, I can find no other justification of the alleged fact that he charged his wife with corresponding with other men.

Nor is there any more substance in the declaration respecting his wife putting things in his drink to poison him. On this subject she declares that upon one occasion he asked her if she had put some poison in something she was giving him, and on other occasions he had suspiciously eyed the milk which she was administering to him. But when it is considered that for long before and after this alleged conduct the deceased continued to take at his own table meals which his wife prepared, to drink of coffee which she made and which she did not drink, and to take, at least at times, the medicines directed to be administered from her hands, and that this continued until his death, I do not think it too much to say that it is unreasonable to declare that he had charged her with attempting to poison him, and it is erroneous to deduce therefrom the theory of a delusion of poisoning or attempting to poison.

Nor was the conduct of the deceased, if his widow's statement be taken to be true, without indications that, however overbearing and even brutal he was, he had placed reliance upon her judgment and acted upon her suggestions. At the time the church was endeavoring to raise money for the purpose of paying off the mortgage, it is proved that the deceased, in the evening, when he increased his subscription by $150, declared that he did so because his wife had told him that he had not given as much as he ought to have done; and it seems to be shown that he made the additional subscription in her name. As has been stated, when the official board of the church paid off its mortgage and sought to obtain from him an additional gift, he appealed to her

judgment, and upon its being delivered he made no remonstrance or objection, although the amount she suggested was thought by the representatives of the church to be more than they ought to ask or receive. Nor can the provision made by the deceased for his wife be ignored upon this subject. If he had an aversion which was without cause, the product of a diseased mind, founded upon a delusion permanent and persistent, it would be reasonable to expect that when he ascertained that he could dispose of his personal property by testament he would have indicated that aversion by depriving her of all interest in his property except that interest in his real estate, which the law protected. But this conduct, which, on the theory of these experts, would be reasonable to be expected, was not that which deceased adopted. He gave to his wife the life use of the house in which they had resided, with all its furniture. He directed the establishment of a fund to be invested with great precaution, and to be sufficient to be capable of furnishing to his widow $1,200 a year, and he gave as a reason for considering that he was providing well for her that the provision he made was more than double that which he and she both together expended.

In considering whether this provision was liberal in view of the extent of his property, we must not be misled by our views of what would be a proper provision. Captain Wheaton was to make his own will, and form his own judgment upon that subject. If his judgment was not affected by delusion or dementia, it cannot be set aside because it does not accord with our views of what he ought to have done.

The opinions of the expert witnesses called by contestant, which I have above discussed and found not justified by the real facts, are furthermore opposed by the opinions of many witnesses who were the friends or business and church associates of the deceased, and who express their opinions upon facts and observations testified to by them. They are opposed likewise to the opinion of an expert witness who was examined by the proponent of the will, and who declares that in his wide experience of mental diseases he has not observed a case of senile dementia in which the person was the subject of permanent or dominating delusions. In this conflict of opinion it is not easy to decide, but

it is safe to adopt the view expressed by the witness last referred to, when he declares that a suggested delusion, say as to poisoning or attempt at poisoning, could not be inferred from a single or few statements when the subject continued to partake of food and drink prepared by the person toward whom the alleged delusion was pointed.

My review of the evidence leads me to the conclusion that the deceased was possessed of testamentary capacity when he executed the disputed paper, and that the decree so declaring and admitting the paper to probate as his last will and testament was proper to be made, and must be affirmed.